IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HYMON AUGUSTA WALKER,          §
          Petitioner,          §
                               §
VS.                            §          CIVIL ACTION NO. H-07-3108
                               §
NATHANIEL QUARTERMAN,          §
          Respondent.          §

## MEMORANDUM AND OPINION

Petitioner, Hymon Augusta Walker, seeks habeas corpus relief under 28 U.S.C.

§ 2254, challenging a conviction in the 176th Judicial District Court of Harris County,

Texas.  Respondent filed a motion for summary judgment, (Docket Entry No. 13), and

copies of the state court record.  Walker has filed his response.  (Docket Entry No. 16).

After consideration of the motion and response, the record, and applicable authorities,

the court grants respondent's motion.  The reasons for this ruling are stated below.

I.     Background

A jury found Walker guilty of the felony offense of aggravated sexual assault of

a child. (Cause Number 835558).  Walker pleaded true to the enhancement paragraph

relating to a prior conviction for sexual assault in Cause Number 628712.   On

November 10, 2000, the jury sentenced Walker to life imprisonment.  The Tenth Court

of Appeals of Texas affirmed Walker's conviction on October 9, 2002.  *Walker v.*

*State,* No. 10-01-037-CR slip op. at 1 (Tex. App. -- Waco 2002, pet. ref'd)(not designated for publication). Walker did not file a timely petition for discretionary review in the Texas Court of Criminal Appeals. Walker filed an application for state habeas corpus relief on July 29, 2004, in which he argued that appellate counsel rendered ineffective assistance and deprived him of the right to file a petition for discretionary review. *Ex parte Walker,* Application No. 58,506-02 at cover. The trial court made written findings of fact and conclusions of law and recommended that relief be granted. *Id.* at 99. On October 26, 2005, the Texas Court of Criminal Appeals granted relief to the extent that Walker was granted leave to file an out-of-time PDR. The Texas Court of Criminal Appeals refused Walker's petition for discretionary review on June 1, 2006. Walker filed a second state application on November 20, 2006, which the Texas Court of Criminal Appeals denied without written order, on findings of the trial court, without a hearing on June 27, 2007. *Ex parte Walker,* Application No. 58,506-03 at cover.

On September 25, 2007, this court received Walker's federal petition. Walker contends that his conviction is void for the following reasons:

(1) The trial court improperly admitted evidence at trial and the appellate court erred in finding this admission harmless;

(2) The State's DNA evidence was not reliable;

(3) Trial counsel rendered ineffective assistance;

(4) The prosecutor engaged in misconduct; and

(5) Appellate counsel rendered ineffective assistance.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-8E).

## II.  Statement of Facts

The Complainant testified that she was fourteen years old and attended Barbara Jordan High School.  (Reporter's Record, Vol. III, p. 8). The Complainant testified that in her leisure time she liked to write poems and listen to music.  (*Id.* at 10).  She testified that she was an only child and that she had a good relationship with her mother and father  (*Id.* at 12).

The Complainant testified that she first met Walker at the end of January while babysitting for a neighbor.  She had been babysitting for that neighbor, Ms. Nichole Sanders, for about two weeks.  She testified that she knew Walker as "Bear."  She testified that on the first night she met him, Walker walked her home.  At that time, he asked her how old she was, what school she attended, and commented that she did not look her age.

The Complainant saw Walker again on February 2, 2000 when she went to babysit at Ms. Sanders's home.  Ms. Sanders arranged for Walker to take over the babysitting duties so that the Complainant could go home and get ready for school the

next morning. (*Id.* at 14). The Complainant put the children to bed and was playing on the computer which was in the living room. At approximately 9:00 p.m., Walker came to Ms. Sanders's home after work and was getting ready for bed. (*Id.* at 17). He changed from a suit and tie into boxers and a T-shirt. He came over to the Complainant and started talking to her. He asked her if she had friends who knew how to keep their business to themselves. The Complainant had been preparing to go home, but he asked her to stay a little longer.

The Complainant turned off the computer, and mentioned that her back hurt. Walker asked if she wanted a back rub, and she said yes. (*Id.* at 18). Walker initially rubbed her back over her clothes. Then he started rubbing her back under her clothes. He moved his hands toward her chest. She started to get up, and he pushed her back down. (*Id.* at 19). The Complainant did not say anything because she was intimidated. Walker then turned the Complainant over onto her back and pulled down her pants and panties. The Complainant testified that she was scared and intimidated. She testified that he then put his penis in her vagina. Walker then left the room and returned with a washcloth with warm water. He asked her to wipe herself. (*Id.* at 23). She did not wipe herself, so he wiped her.

Walker asked the Complainant if she was going to tell anyone, and she said, "no." (*Id* at 23). The Complainant wanted to tell someone, but she thought people

would view her differently in light of what had happened. That same night, she confided in a close friend, stating that she felt dirty. (*Id.* at 24).

On February 3, 2000, Ms. Sanders asked if the Complainant could babysit while she went to church. The Complainant asked if Walker would be there, and Ms. Sanders said he was not going to be there. (*Id.* at 24). The Complainant went to Ms. Sanders's home at 6:30 p.m. At approximately 7:30 or 8:00 p.m., Walker came to Ms. Sanders's home. The Complainant was shocked to see him there. The Complainant testified she was ironing her clothes in Ms. Sanders's living room and Walker came and sat on the sofa. The Complainant left the room to retrieve some personal items. When she returned, the lights were off and there was a blanket on the floor. She thought "it" might happen again, but she had to collect her things from the living room. Walker asked her to come and sit on the sofa and talk to him, so she did. (*Id.* at 28). Walker began to touch her chest and legs. Walker led her to the floor and he placed his sexual organ in hers. She felt something warm and wet on her inner thigh, so she wiped it off. (*Id.* at 32).

The Complainant testified that she felt bad, but she did not know why. She returned to her home and called a friend to tell him what happened. She was reluctant to tell her mother, so she asked her friend to tell her mother. When her mother heard what happened, she started crying and ran to tell her husband. The Complainant felt

scared and realized she would have to tell many more people about what she went through. (*Id.* at 34). The Complainant testified that she felt violated, and at times, she felt like it was her fault. (*Id.* at 34). Upon learning about what happened, the Complainant's father became very upset and called the police. The police did not send anyone out and gave him a different telephone number. When he called the number and got a recorded message, he decided to push the panic button on the burglar alarm system. (*Id.* at 35).

Once the police arrived, the Complainant talked with a female officer in the officer's patrol car. The Complainant went into her home, got a change of clothes, and went to the Texas Children's Hospital. She explained that the assault happened at about 9:00 p.m. on February 3, 2000, her parents learned of the assault at about 10:30 p.m. on February 3, 2000, and she was examined at about 6:00 a.m. on February 4, 2000. (*Id.* at 37). She identified State's Exhibit 5 as the T-shirt, State's Exhibit 6 as the warm-up pants, and State's Exhibit 7 as the underwear she was wearing on February 3, 2000. (*Id.* at 39). The Complainant identified State's Exhibits 1, 2, 3, and 4 as photographs of Ms. Sanders's home where the sexual assaults took place.

The Complainant testified that she tried not to think about the assault, but she did get depressed. She explained that sometimes she cried and at other times she wrote poetry about her feelings. (*Id.* at 42).

Anthony Karl Winston testified that he had been married for twenty years and was the Complainant's father. (Reporter's Record, Vol. III, p. 57). He testified that he had a close relationship with his daughter. (*Id.* at 58). On February 3, 2000, the Complainant went to babysit a few doors down the street. That night he heard his wife talking with the Complainant. Mr. Winston went to inquire about the subject of their conversation. The Complainant was shaken and was crying. His wife told him what had happened. (*Id.* at 60). Upon learning that the Complainant had been raped, he tried to call 911. The 911 operator told him to call another number. When he called the number, he got a recorded message. Mr. Winston tried calling 911 several times with no success. Mr. Winston was very upset and proceeded down the street with his gun. He then realized that acting on his impulse would cause more trouble for his family, so he returned home and called 911 again. (*Id.* at 61). Mr. Winston pushed the panic button on the burglar alarm in an effort to get the police to respond. The police, when they arrived, were upset with Mr. Winston for using the panic button. He went into the house and saw that their friends and the police were helping to calm his wife and the Complainant. (*Id.* at 63).

Officer Barbara L. Gastmeyer testified that she and other officers responded to a panic alarm. (Reporter's Record, Vol. III, p. 65).   They approached with flashing overhead lights and sirens.   Mr. Winston told the police that his daughter had been sexually assaulted. (*Id.* at 66). Officer Gastmeyer interviewed the Complainant while the other officers apprehended the suspect. She testified that the whole family was very upset and agitated.   Officer Gastmeyer testified that during the interview, the Complainant was upset but very calm and thorough about relating exactly what had happened to her. (*Id.* at 67).  Officer Gastmeyer transported the Complainant and her mother to Texas Children's Hospital for a sexual assault examination.

Dr. Ada Earp testified that she was a pediatric emergency physician at Texas Children's Hospital. (Reporter's Record, Vol. IV, p. 5). She explained that during a sexual assault examination, the victim's clothing was taken, placed in bags, and sealed. The victim was asked to sit on a white piece of paper and debris was collected.  They collected scalp hairs, pubic hairs, and fingernail scrapings. She explained that once the sexual assault kit is opened, no one is allowed to enter or exit the examination room. (*Id.* at 7).  She examined the Complainant's body and genitalia for signs of trauma.  She identified State's Exhibit 9 and 10 as the sexual assault kit performed on the Complainant. The Complainant's demeanor was quiet and withdrawn. (*Id.* at 10).  Dr. Earp testified that the Complainant's physical examination was normal, and there were

no signs of tears, trauma, or bruising. She explained that this did not mean that no sexual activity took place. She explained that in seventy percent of cases there are no signs of sexual activity. (*Id.* at 11). She did not find any type of seminal fluid on the Complainant's body. She noted that the lack of seminal fluid can be affected by whether the Complainant showered or went to the restroom. (*Id.* at 12).

Shelly Amaza testified that she was a Registered Nurse in the emergency center of the Texas Children's Hospital. (Reporter's Record, Vol. IV, p. 15). She assisted the physician in the sexual assault examination. (*Id.* at 16).

During cross-examination, counsel questioned Nurse Amaza about the chain of custody of the sexual assault kit. She explained that once the kit was sealed, it was placed in a special locked refrigerator for evidence. Only about five nurses had the keys to the refrigerator. (*Id.* at 22).

E. Byrd, Jr., testified that he worked for the Houston Police Department. (Reporter's Record, Vol. IV, p. 24). On February 4, 2000, he was dispatched to pick up the sexual assault kit from Texas Children's Hospital. He contacted the nurse in charge and watched her retrieve the sexual assault kit from the locked refrigerator. He signed the necessary paperwork for taking custody of the sexual assault kit. (*Id.* at 25-26). He then transported it to the Houston Police Department central property room. (*Id.* at 26)   He also retrieved three bags that appeared to be sealed. (*Id.* at 28).

Michaeline June Frost, an officer with the Houston Police Department, testified that she worked in the juvenile division of the sex crimes squad. (Reporter's Record, Vol. IV, p. 36). She testified that she conducted investigations of sexual assaults of children. (*Id.* at 36). She also collected blood samples from suspects to make DNA comparisons. On June 14, 2000, she obtained a search warrant to obtain a blood sample from Walker. She observed the blood being drawn from Walker, and she then transported it to the HPD Crime Lab. (*Id.* at 37).

On cross-examination, Officer Frost testified that M. Henry was a male. (*Id.* at 42). On re-direct examination, Officer Frost testified that she had done numerous blood draws since June 2000. She explained that there were several people in the lab that day, and she may have become confused. (*Id.* at 46).

Sally Storms testified that she was the Lab Manager at the Harris County Sheriff's Department. (Reporter's Record, Vol. IV, p. 47). She testified that she took hundreds of blood samples for purposes of DNA testing. Though she did not recall drawing Walker's blood, her initials were on the vial. (*Id.* at 49). She identified the handwriting on State's Exhibit 11 which contained Walker's blood and saliva samples, as her handwriting.

Mary Childs-Henry testified that she was a forensic biologist for the Houston Police Department Crime Lab. (Reporter's Record, Vol. IV, p. 59). She obtained

custody of State's Exhibit 10, the sexual assault kit.  (*Id*. at 63-64). From her examination of State's Exhibit 10, she found no seminal fluids.  (*Id*. at 65).  She examined each item of the Complainant's clothing separately, looking for bodily fluids. She found fluids on the crotch of the panties, on the T-shirt, and the warm-up pants. The P 30 test reveals the presence of the P 30 antigen which is only present in male seminal fluid.  She added two chemicals to the area suspected of having bodily fluids. A deep purple color indicated the presence of semen. (*Id*. at 66).  She then cut the area containing semen and stored them for later DNA analysis. She requested a blood sample be taken from Walker.

Ms. Henry testified that Officer Frost brought her State's Exhibit 11.  She put Walker's blood on a stain card.  Ms. Henry performed a DNA extraction. DNA is the genetic blueprint present in all living matter.  Other than identical twins, she explained that everyone's DNA is different.  She performed a DNA extraction for each of the three items of clothing.  This involved adding chemicals to cause the cells containing the DNA to rupture and thereby release the DNA.  She extracted DNA from the T-shirt and the panties, but not the warmup pants.  (*Id*. at 73).  She did not perform the DNA analysis; rather, she gave the DNA extractions to Raynard Cockrell.  Specifically, Ms. Henry gave him the known samples, which were the blood samples, and the unknown samples, which were the samples from the panties and T-shirt.  (*Id*. at 72).  Ms. Henry

testified that it was not unusual to find DNA on clothing and not in the sexual assault kit. (*Id*. at 80).

Raynard Cockrell testified that he was a DNA examiner for the Houston Police Department Crime Laboratory. (Reporter's Record, Vol. IV, p. 81). He used electrophoresis to develop a DNA profile. (*Id*. at 85). He compared the known DNA samples of the Complainant and Walker with the unknown DNA samples from the panties and T-shirt. He concluded that the unknown DNA samples matched the known sample of Walker. The DNA profile statistically only matches Walker.

## III.   The Applicable Legal Standards

This court reviews Walker's petition for writ of habeas corpus under the federal habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits." An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

In ruling on a motion for summary judgment, this court views the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must look "through the prism of AEDPA deference." *Ward v. Dretke*, 420 F.3d 479, 499 (5th Cir. 2005).

The AEDPA provides as follows, in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson*, 210 F.3d

481, 485 (5th Cir. 2000).   A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.   *Williams v. Taylor,* 120 S. Ct. 1495 (2000).   A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.   In deciding whether a state court's application was unreasonable, this court considers whether the application was "objectively unreasonable."   *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000).   Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2). *Martin v. Cain,* 246 F.3d 471, 475 (5th Cir. 2001).   In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C.

§ 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)). The petitioner's claims for relief are examined below under the applicable legal standard.

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.  Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct.  *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Walker is a *pro se* petitioner.  In this circuit *pro se* habeas petitions are construed liberally and are not held to the same stringent and rigorous standards as are

15

pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh,* 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This court accords Walker's state and federal habeas petitions a broad interpretation. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## IV.    The Claim Based on Trial Court Error

Walker asserts that the trial court's error rendered the proceedings against him unfair. Walker alleges that his due process rights were violated when the trial court overruled counsel's objection to a poem written by the Complainant. (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, p. 7). In a related claim, Walker complains that the appellate court erred in affirming his conviction after finding that the trial court's error was harmless.

On direct examination, the Complainant read the poem she wrote following the sexual assault:

> ... My Story ...
>
> The story of a girl so sad with her head hung low, is undergoing more pain than anyone could ever know. The feeling she feels inside her of emptiness and sorrow hoping the sun will shine through the clouds of tomorrow. This story is of my life and how I see me. Sometimes you can't be what people expect you to be.

(Reporter's Record, Vol. III, p. 43).   The handwritten poem was introduced as an exhibit at trial and was again read by the prosecutor at the closing of jury argument at the guilt/innocence stage of the trial.

When a federal court reviews state court evidentiary rulings on a petition for habeas corpus, it will grant relief only if the state court error is sufficiently egregious as to render the entire trial fundamentally unfair. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied,* 508 U.S. 978 (1993).   "A state court's evidentiary ruling presents a cognizable habeas claim only if it runs afoul of a specific constitutional right or renders the trial fundamentally unfair." *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994), *cert. denied,* 513 U.S. 1163 (1995).   The challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire case. *Jernigan v. Collins*, 980 F.2d at 298; *Bridge v. Lynaugh,* 838 F.2d at 772; *Thomas v. Lynaugh,* 812 F.2d 225, 230 (5th Cir.), *cert. denied,* 484 U.S. 842 (1987).   The test to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *See Guidroz v. Lynaugh,* 852 F.2d 832, 835 (5th Cir. 1988); *Rogers v. Lynaugh,* 848 F.2d 606, 609 (5th Cir. 1988).

The Tenth Court of Appeals considered, and rejected, Walker's claim that trial court error was not harmless error and found as follows:

Appellant argues the poem was not relevant to any issue in the case and was used by the State to "inflame and arouse" the passions of the jury. The State responds that appellant's trial objection did not preserve his complaint on appeal and that the error was waived when other evidence about sad poetry written by the victim was introduced without objection. The State also argues the poem was relevant because "writing sad poems has a tendency to make the existence of the facts and circumstances of the sexual assault more probable than it would be without the evidence." Finally, the State argues any error in the admission of the poem was harmless.

Whether defense counsel's trial objection was sufficient to preserve his "relevance" complaint on appeal presents a close question. At the time the State moved for its introduction, defense counsel stated "[w]e would object to the introduction of the poem. It doesn't have any evidentiary weight as to the charges that we're dealing with." While we believe that this objection was somewhat awkwardly worded, we conclude it was sufficient to put the trial court on notice that counsel's objection questioned the relevance of the poem to the charges at guilt/innocence. *See* TEX. R. EVID. 103(a)(1) (requiring the party complaining of the admission of evidence to make a timely objection or motion to strike, stating the specific ground of the objection, if the specific ground is not apparent from the context); *see also Gonzales v. State,* 868 S.W.2d 854, 856 (Tex. App.—Dallas 1993, no pet.) (holding objection sufficient where it is clear the parties and trial court knew its nature).

Another close question is presented by the State's claim that similar evidence was introduced by the State without objection from appellant. The evidence considered "similar" by the State was Tina's testimony that she suffers from depression and sometimes writes sad poetry to express her feelings. While it is true appellant did not object to this testimony, we see a distinction between general testimony that Tina wrote poetry to express her sadness, and the

18

introduction of a specific poem written by her. Under the particular circumstances present in this case, we do not find appellant waived his complaint by failing to object to other general testimony relating to poetry.

The State next argues the contents of the poem made the facts and circumstances of the offense more probable than had the poem not been admitted. In other words, the State argues the poem was relevant to prove appellant's guilt. *See* Tex. R. Evid. 401. We do not agree. Although the poem may have been admissible as victim impact evidence at the trial's punishment stage, we believe the poem had no relevance to any issue at guilt/innocence and should not have been admitted. The fact that Tina's poem was irrelevant to any issue in our case, in part, leads us to conclude that the error was harmless. The improper admission of evidence at trial court requires the harm analysis for non-constitutional error. *See* TEX. R. APP. P. 44.2(b); *see also Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Id.,* citing *King v. State,* 953 S.W.2d 266 (Tex. Crim. App. 1997). Tina's poem contains no reference to appellant or any circumstance of the offense. Nor did it have a tendency to make the victim any more believable. In light of the record as a whole, we are satisfied the error did not influence the jury. Point one is overruled.

*Walker v. State,* No. 10-01-037-CR slip op. at 3-5 (Tex. App. -- Waco 2002, pet. ref'd)(not designated for publication).

Walker raised this allegation in his state writ application. The state habeas court found:

> 1. Because the applicant failed to raise on direct appeal his instant claims of Court of Appeals error and prosecutorial misconduct, the applicant is procedurally barred from raising these claims in the instant proceeding.
>
> 2. Further, because the applicant's challenge to the admissibility of the poem was raised on direct appeal and rejected by the Court of Appeals, this allegation need not be reconsidered on habeas.
>
> 3. In the alternative and without waiving the foregoing, the applicant fails to allege sufficient facts which, if true, would show that his due process rights were violated by prosecutorial misconduct or Court of Appeals error.

*Ex parte Walker*, Application No. 58,506-03 at 123 (citations omitted).

The Texas Court of Appeals held that the claims of Court of Appeals error and prosecutorial misconduct were procedurally barred because he failed to raise them on direct appeal. Normally, this holding would constitute an adequate and independent state ground for the dismissal of Walker's claims of appeal court error and prosecutorial misconduct under the doctrine of procedural default. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 2059 (2006); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)). However, respondent failed to raise this affirmative defense in his Motion for Summary Judgment with Brief in Support; and the court will not raise it for him. Walker has had neither notice that the procedural default might apply to his

appellate court error claim, nor an opportunity to raise one of the exceptions to the doctrine. *Cf. Prieto v. Quarterman*, 456 F.3d 511, 518 (5th Cir. 2006) ("[W] e have never approved of a sua sponte application of the procedural bar defense when the petitioner has absolutely no notice or opportunity to respond."). Accordingly, the court will address the claims on the merits.

Even if introduction of the poem was erroneous, Walker has not shown that admission of the poem played a "crucial, critical, and highly significant" role in the jury's determination. "[I]n reviewing state court evidentiary rulings, the federal habeas court's role 'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness' under the Due Process Clause" of the Fourteenth Amendment. *Castillo v. Johnson*, 141 F.3d 218, 222, 224 (5th Cir. 1998) (instructing that "[f]ederal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law").

Even assuming that the Complainant's poem did constitute victim impact evidence, the admission of such evidence does not violate the Fourteenth Amendment unless the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 824 (1991) (recognizing that "[i]n the majority of cases, . . . victim impact evidence serves entirely legitimate

purposes"). Although Payne considered the use of victim impact testimony during the penalty phase of a capital case, the Fifth Circuit also adheres to Payne's fundamental fairness standard in cases involving a challenge to victim impact evidence introduced during the guilt-innocence phase. *See Castillo*, 141 F.3d at 223-24.  Regardless of whether the testimony at issue is properly categorized as victim impact evidence, the same analysis applies in determining whether Walker is entitled to habeas relief on this claim.

In *Pursley v. Dretke*, 2004 WL 2617939, 114 Fed. Appx. 630 (5th Cir. 2004), an unpublished opinion, the Fifth Circuit reasoned as follows:

> In this case, the record indicates that Cook was brutally murdered at the hands of a stranger; that the killer had spent some time with Cook in his home on the night of the murder, and that he later killed Cook in his own car before leaving the body in a wooded area. The record also indicates that at about the same time that Cook left work and drove down Highway 59, Pursley was most likely walking down the same road. The State's theory was that Cook saw Pursley walking alongside the road and stopped his car to offer Pursley a ride. Because the average person probably would not pick up a hitchhiker at night, the State sought to elicit testimony that it would not be unusual for Cook to do so. Cook's sister, his mother, and a friend of Cook all testified that they knew that Cook would stop and help people on the road or offer them rides. Defense counsel did not object to this testimony, and in fact, asked certain witnesses whether they knew if Cook ever picked up hitchhikers. Given the brutality of the murder and the fact that similar testimony of other witnesses (offered without objection) indicated that

Cook was known to help people on the highway, we find that Godfrey's testimony was merely cumulative of other evidence and did not "inflame [jurors'] passions more than did the facts of the crime" so as to deny Pursley a fundamentally fair trial. *See Payne*, 501 U.S. at 832 (O'Connor, J., concurring). Under these circumstances, reasonable jurists could not debate or find wrong the district court's conclusion that the admission of Godfrey's testimony did not violate Pursley's Eighth or Fourteenth amendment rights.

(*Id.*).

In the instant case, the Complainant testified about the sexual assault on the evening of February 2, 2000. She testified that she felt bad about what had happened and that she felt dirty. She confided in a close friend, but did not tell her parents. She gave a detailed account of the sexual assault on the evening of February 3, 2000. She returned home and confided in a friend. She, still unable to tell her parents, asked the friend to tell her parents what had happened. The Complainant's father testified that soon after the assault, he saw that the Complainant was shaken and was crying. Officer Gastmeyer testified that the entire family appeared upset and agitated.

Having considered the record, this court finds that allowing the Complainant to read her poem did not influence the jury or had only a slight effect. The jury heard the Complainant and the Complainant's father testify that their family was very close. Despite this bond, the Complainant was unable to tell her parents about the sexual

assault. She testified that during both sexual assaults, she was intimidated and scared. She testified that the reason she could not tell anyone was that she felt dirty and she thought people would view her differently in light of the sexual assault. Even if the poem had been excluded, the jury would have heard plenty of other testimony showing that the Complainant was emotionally traumatized by the sexual assault. The poem described her feelings of sadness, and was cumulative of testimony already before the jury. Walker has failed to show that the trial court's admission of the Complainant's poem rendered his trial fundamentally unfair or that there was a reasonable probability that the verdict would have been different had the trial been conducted properly. Any such error was harmless under *Brecht v. Abrahamson,* 507 U.S. at 623 (federal habeas relief requires a showing that a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict."). There was overwhelming evidence against Walker. He has failed to raise an issue as to whether admission of the poem had an injurious effect or influence on the jury's verdict. Walker's claim of trial court error and related claim of appellate court error, lack merit. Walker has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

    Walker is not entitled to federal habeas relief on this claim.

## V.      The Claim Based on the Presentation of False Evidence

Walker states that newly discovered evidence proves that the DNA evidence

introduced at this trial was false.  In a letter dated March 12, 2003, the Harris County

District Attorney's Office notified Walker that his case contained DNA evidence

analyzed by the Houston Police Department Crime Laboratory.  An independent audit

of the DNA/Serology section of the Houston Police Department Crime Laboratory

revealed several areas of non-compliance with DNA lab procedures established by the

Federal Bureau of Investigation.  Walker states that he discovered that the State's

expert witnesses were untrained, uncertified, undereducated, and unqualified, to give

the testimony they gave at Walker's trial.  Walker claims that Mary Childs-Henry and

Raynard Cockrell committed perjury when they each testified to having completed

required courses to be certified DNA analysts.  Walker asserts that in order to qualify

as a DNA analyst, one must have studied statistics, genetics, biochemistry, and

molecular biology.  Walker claims that newly discovered evidence shows that at the

time of Walker's trial, neither Mary Childs-Henry nor Raynard Cockrell had completed

such courses and did not qualify as expert DNA Analysts.  He claims that the jury

never heard that the crime lab was not in compliance with DNA Lab Procedures

established by the Federal Bureau of Investigation. He insists that the jury relied on the

evidence and testimony of the Crime Lab workers and that if the newly discovered

evidence had been known and presented to the jury, he would have had an opportunity to properly impeach both Mary Childs-Henry and Raynard Cockrell.  He claims that he would have been able to suppress the DNA evidence analyzed by them.

This claim is properly construed as a claim based on the knowing use of false testimony.  In order to establish a basis for relief a petitioner must prove that the prosecution knowingly presented false testimony. *Napue v. Illinois,* 360 U.S. 264 (1959).  Mere inconsistencies or errors in a witness's testimony do not, standing alone, establish the existence of perjury. *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990). The jury heard the testimony of Mary Childs-Henry and Raynard Cockrell.  Walker's conclusional assertions that testimony was false were insufficient to show that the State knowingly presented false, material testimony. *See United States v. Leahy,* 82 F.3d 624, 632 (5th Cir. 1996); *United States v. Washington,* 44 F.3d 1271, 1282 (5th Cir. 1995).  Although it offends constitutional due process for a prosecutor to knowingly use or intentionally fail to correct testimony that he knows to be false, nothing in the record suggests that Mary Childs-Henry and Raynard Cockrell's testimony was false or that the State prosecutor knew their testimony was in any way false. *See Napue v. Illinois,* 360 U.S. 264, 271 (1959).  Discrepancies in witnesses' testimony merely establish a credibility question for the jury and do not suffice to establish that the

testimony was false. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler*, 843 F.2d 73, 76 (5th Cir. 1988).

The record shows that Walker's trial took place on November 10, 2000. (Clerk's Record, Vol. I, pp. 66-68). Walker apparently claims that the State failed to disclose favorable evidence in the form of newspaper articles that described the various problems with the HPD Crime Laboratory. In support of this claim, Walker attached articles with his state application for habeas relief. The articles containing the information Walker claims should have been disclosed were dated September 7, 2003 and February 27, 2004. *Ex parte Walker*, Application No. 58,506-03 at 61-68, 76. In his response to the respondent's motion for summary judgment, Walker includes an article dated January 8, 2006. (Docket Entry 16, Petitioner's Response, Appendix, pp. 2-5).

A letter from Charles Rosenthal, former Harris County District Attorney's Office, dated March 12, 2003, notified Walker of the problems with the Crime Lab and of a pending retest of the DNA evidence in his case. Walker provided a copy of that letter with his state application. *Ex parte Walker*, Application No. 58,506-03 at 60. Walker fails to show that any of the information contained in his exhibits was in the possession of the State at the time of his trial in 2000. Walker also fails to show that any of the information in these articles specifically applies to the procedures used to

test the evidence in his case or that the procedures in his case resulted in an incorrect result.     The DNA evidence in Walker's case was retested by Identigene, an independent laboratory. (First Motion for Rehearing of Decision Rendered in Appeal, Ex. 4, pp. 1-2). The results of the retest are as follows:

> A full male DNA profile was obtained for the sperm fraction of the cutting from the panty crotch (Item 118065) and the cutting from t-shirt (stain #2) (Item 118068). The profile obtained from Hymon Walker (Item 118060) matches the DNA profile from the sperm fraction of the cutting from the panty crotch and the cutting from t-shirt at all 13 STR loci tested. The frequency of this profile from an unrelated individual chosen at random from the population at large is less than 1 in $1.96 \times 10^{19}$ in African American, Caucasian, and Hispanic populations (FBI database). The epithelial fraction of the cutting from the panty crotch (Item 118064) and the cutting from t-shirt (stain #2) (Item 118067) revealed a mixture of male and female DNA types. Hymon Walker and Dominique Winston cannot be excluded as potential donors to this mixture. All extraction and PROSECUTOR controls gave expected results.

*Id.*

Walker next complains that Mary Childs-Henry, the HPD Crime Lab analyst who was found to be unqualified to handle the DNA evidence in Walker's case, was also the same analyst who prepared the evidence for retesting by an independent lab. Walker claims that Mary Childs-Henry could have tampered with the evidence knowing that an unfavorable result by the independent lab would have damaged her

credibility   Walker asserts that once Henry was found to be unqualified to handle such evidence, she should not have been allowed to prepare it for retesting.   He claims there was a possibility that she tainted the evidence.   He argues that the results of the retesting are unreliable.

In *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983), the Fifth Circuit held that conclusory allegations are an inadequate basis for federal habeas relief, stating that "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Id.*

The state habeas court found:

> 8. The applicant fails to allege sufficient facts which, if true, would show that perjured testimony occurred in his trial.

> 9. The applicant fails to allege sufficient facts which, if true, would show, by clear and convincing evidence, that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the alleged new evidence.

*Ex parte Walker*, Application No. 58,506-03 at 124.   The Court of Criminal Appeals expressly based its denial of habeas relief on this finding.   These credibility determinations are entitled to a presumption of correctness.   28 U.S.C. § 2254(e)(1);

*Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g).  Walker has not produced clear and convincing evidence to rebut this finding.   The state court's decision was not contrary to clearly established federal law.

Walker is not entitled to habeas relief on this claim.  28 U.S.C. § 2254(d)(1).

## VI.   The Claim of Ineffective Assistance of Trial Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and petitioner suffered prejudice as a result.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Martin v. Cain,* 246 F.3d 471, 477 (5th Cir. 2001).   The district court may dispose of a claim if counsel either rendered reasonably effective assistance or no prejudice can be shown.  A court evaluating a claim of ineffective assistance need not address the reasonableness component first.  If a petitioner fails to make one of the required showings, the court need not address the other.    *Strickland,* 466 U.S. at 697.

In assessing the reasonableness of counsel's performance, the court must indulge a strong presumption that the performance falls within the "wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689; *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir. 1993).   If counsel's action is based on well-informed strategic

decisions, it is "well within the range of practical choices not to be second-guessed." *Rector v. Johnson,* 120 F.3d 551, 564 (1997)(quoting *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993)).

As to the prejudice portion of the inquiry, a convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. An attorney's strategic choices based on information supplied by the defendant and gathered from an investigation of the relevant law and facts "are virtually unchallengeable." *Id.* at 691.

Walker complains that counsel failed to investigate the handling of the evidence used against him at trial. He claims that counsel failed to investigate the backgrounds of the expert witnesses who were to testify against Walker. Walker contends that if counsel had done a proper investigation, he would have been able to impeach the DNA lab analysts' testimony by showing that they were not qualified. Walker claims that counsel should have cross-examined the witnesses to impeach or disqualify them as "experts." Walker asserts that counsel's failure to do so allowed evidence and testimony to be heard by the jury which could have been suppressed had he shown that the witnesses were unqualified as experts.

Walker claims that the State's case was weak, and had it not been for admission of the DNA testimony, he would have been acquitted. Walker points to

the testimony of Doctor Ada Earp, an emergency physician at Texas Children's Hospital. Walker notes that she found no evidence of tears, trauma, nor of any bruising. She also found no evidence of any semen, nor of any sperm in or around her vaginal area. The same doctor also when asked to identify some of the contents pulled from the sexual assault kit, could not identify a tube-like item counsel had pulled from within the kit, and did not know how it had gotten there. Walker also argues that there was a lapse in the chain of custody. He further notes that Officer M. Frost testified she gave the Petitioner's blood and saliva samples to a man named M.C. Henry. Though confronted with the fact that M.C. Henry was a woman, Officer frost was adamant about having delivered the DNA samples to a man.

Walker claims that counsel was aware that the state intended to call Mary Childs-Henry and Raynard Cockrell as State witnesses to testify as DNA experts. During trial Mary Childs-Henry testified that she met all the requisites and qualifications as a DNA Analyst and thereby was an expert in her field to testify as a DNA expert. Likewise, Raynard Cockrell also testified that he met the requisites and qualifications as a DNA Analyst and thereby was an expert in his field to testify as a DNA expert.

Walker faults counsel for failing to discover the problems with the crime lab before anyone else. Walker does not explain how counsel should have known to

32

investigate the qualifications of the State's expert witnesses. Walker offers articles revealing problems with the Houston Police Department crime lab's testing procedures. As noted, these articles were published long after Walker's trial. As to the prejudice prong of the *Strickland* inquiry, Walker offers no evidence to suggest that a retest would have exonerated him and altered the outcome at trial.

The record shows that following a voluntary audit by the Harris County District Attorney's Office of the Houston Police Department crime lab, the Harris County District Attorney's Office decided on March 12, 2003, to have an independent laboratory re-evaluate Walker's DNA. The re-evaluation confirmed the results obtained by the Houston Police Department Crime Lab's DNA analysis.

In *Skinner v. Quarterman*, 528 F.3d 336 (5th Cir. 2008), the Fifth Circuit considered an ineffective assistance claim based on failure to test DNA and concluded as follows:

> It is not debatable among jurists of reason that counsel was not deficient in failing to test the evidence. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *see also Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (observing that failure to present evidence does "not constitute 'deficient' performance within the meaning

of [ Washington] if [counsel] could have concluded, for
tactical reasons, that attempting to present such evidence
would be unwise.").

At the evidentiary hearing, counsel explained that he did
not request DNA testing of the additional evidence
because of the risk that such testing would reveal that the
DNA was Skinner's instead of Donnell's or some other
person's. Contrary to Skinner's contention that counsel
had "nothing to lose" and "everything to gain" from DNA
testing, evidence of Skinner's DNA, such as on a knife
handle or under Twila's fingernails, would have been
highly probative, incriminating evidence for the
prosecution. Conducting its own DNA test would also
have deprived the defense of its primary argument at trial
that the government conducted a shoddy investigation. Not
knowing what more thorough DNA testing would have
uncovered, a jury might have found reasonable doubt in
such uncertainty.

Skinner's counsel made an informed, strategic decision
that DNA testing was at least as likely to incriminate
Skinner as to exonerate him and that additional testing was
a gamble not worth taking. Given the "double-edged"
nature of that choice, ineffectiveness cannot be established
by second-guessing. *See Kitchens v. Johnson*, 190 F.3d
698, 703 (5th Cir. 1999) (deeming failure to present
evidence not ineffective because of "double-edged nature
of the evidence involved"); *Boyle v. Johnson*, 93 F.3d 180
(5th Cir. 1996) (same).

*Skinner v. Quarterman*, 528 F.3d 336, 341-342 (5th Cir. 2008).

Similarly, in the instant case, counsel could reasonably have concluded as a

matter of strategy not to order retesting of the DNA. On cross-examination, counsel

questioned Henry about the absence of seminal sperm cells on the vaginal swabs. (Reporter's Record, Vol. III, p. 75). Counsel questioned her about who gave her the sexual assault kit, and she testified that Officer Frost did not give her the sexual assault kit. He questioned her about whether she cut pieces of clothing from the Complainant for DNA analysis. Counsel questioned her about whether the cuttings from the clothing and blood samples were in the crime lab or in court.

On cross-examination of Raynard Cockrell, counsel questioned him about whether the cuttings from the clothing and blood samples were in the crime lab or in court. Counsel asked if Cockrell had the actual extracted DNA with him or whether it was in the crime lab. (Reporter's Record, Vol. III, p. 88). Counsel's strategy appears to have been to attack the chain of custody of the evidence. He also chose to focus on the absence of penetration. In his closing, counsel conceded, "Obviously certain activity occurred," on February 3, 2000. (Reporter's Record, Vol. IV, p. 92). Counsel emphasized that there were, "no tears, no trauma, no semen, no nothing." (*Id.*, at 93). "If there is not penetration of the sexual organ of the female of the sexual organ of the male it's not sexual assault." (*Id.* at 94). Counsel argued that Walker did not place his sexual organ in the Complainant's sexual organ and there was no sexual assault. Counsel chose not to address the presence of DNA on the Complainant's clothing.

Without further evidence that there was some flaw in the State's testing, or that there was some other DNA evidence that would have been helpful to Walker's defense, Walker cannot establish either that defense counsel was ineffective for failing to present evidence that the record indicates would not have been helpful to Walker, or that Walker was prejudiced by defense counsel's decision not to either retest the DNA evidence or present evidence regarding the State's testing.  Rather, the record reveals that counsel was presented with DNA evidence that established, in effect, that the chance that someone other than Walker sexually assaulted the Complainant was infinitesimally small and thus made the reasonable trial strategy of arguing that there was no penetration.

Walker has failed to establish by a preponderance of the evidence either that his trial counsel was ineffective for failing to present any additional evidence regarding the DNA testing or that Walker was prejudiced in any way by trial counsel's choices in this regard.

Walker raised his ineffective assistance claim in his state application and the state habeas court found:

> 4. The applicant fails to allege sufficient facts which, if true, would show that trial or appeal counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there is a

reasonable probability that the result of the proceeding would have been different.

5. The applicant fails to overcome the presumption that trial counsel's decision not to object was made in the exercise of reasonable professional judgment, and the applicant fails to meet his burden in showing that his attorney was ineffective for failing to object.

6. The applicant fails to show that his appeal counsel's arguments fell below an objective standard of reasonableness or that the outcome of the case would have been different had counsel raised different issues.

7. The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Ex parte Walker,* Application No. 58,506-03 at cover (citations omitted). The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. These credibility determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g). Walker has not produced clear and convincing evidence to rebut these findings.

Decisions on the presentation of evidence and witnesses are essentially strategic. Counsel is entitled to a presumption that his performance was adequate.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.

Walker is not entitled to habeas corpus relief on this claim.

## VII.   The Claim Based on Prosecutorial Misconduct

Walker asserts that the prosecutor's use of the poem during his case-in-chief and during his closing argument of the guilt/innocence stage of the trial was a grossly improper appeal to the jury's emotions and sympathy.  Walker complains that this testimony by the Complainant of her inspiration for writing the poem and the reading of the poem herself influenced the jury's deliberation to Walker's detriment.  Walker argues that during his closing argument, the prosecutor appealed to the community's conscience by inflaming the hearts and minds of the jury.    The prosecutor deliberately persuaded the jury to convict on a moral and emotional basis rather than based on their consideration of the relevant evidence before them.  The prosecutor urged the jury to show the community that they were there to protect juvenile and adolescent girls.  He argued that a guilty verdict would deter future lawbreaking and show that they were not going to allow this kind of thing to occur in Harris County and would help alleviate some of her pain.  The comments were so inflammatory that they caused the jury to return a guilty verdict within sixty-six minutes.

During the prosecutor's direct examination of the Complainant, the following exchange took place:

Q.      How do you feel about what Hymon Walker did to you?

A.      I try not to think about it too much, but at times I do get depressed about it at times, and it – it builds up over a period of time but then it all comes out at one time.

Q.      When it comes out how does it come out?

A.      Sometimes I just stay to myself, cry, or I write.

Q.      You write?

A.      Yes.

Q.      What do you write?

A.      Poetry.

Q.      Have you written some poems about this?

A.      Yes.

Q.      About what he did to you?

A.      No, not too much in detail, but about my feelings.

Q.      How would you describe those poems?

A.      Sad.

(Reporter's Record, Vol. III, pp. 42).  The Complainant then read her poem:

        . . . My Story . . .

The story of a girl so sad with her head hung low, is undergoing more pain than anyone could ever know. The feeling she feels inside her of emptiness and sorrow hoping the sun will shine through the clouds of tomorrow. This story is of my life and how I see me. Sometimes you can't be what people expect you to be.

(Reporter's Record, Vol. III, p. 43).

During his closing argument, the prosecutor argued that Walker had sex with an underaged victim. He told the jury that the Complainant was a very thoughtful young woman with a very calm demeanor. He told the jury that it was a painful process for the Complainant to come to court and tell people about what had happened. He urged the jury to send a message by their verdict that they would protect adolescent girls from sexual predators. He read Complainant's poem to show that the Complainant was a very thoughtful person and the jury should help the Complainant move on with her life. (Reporter's Record, Vol. IV, pp. 97-98).

In habeas corpus proceedings, alleged prosecutorial misconduct during a state criminal trial is reviewed to determine whether it so infected the [trial] with unfairness as to make the resulting [conviction] a denial of due process. *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000), *cert. dismissed*, 121 S. Ct. 902 (2001)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *accord Greer v. Miller*, 483 U.S. 756, 765 (1987). Improper conduct by a state prosecutor is not

of constitutional magnitude and will not warrant federal habeas corpus relief unless the conduct is so prejudicial that it rendered the trial fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *See Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001).   To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *Greer*, 483 U.S. at 765.   "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992).   A petitioner has the burden of showing the prosecutor's action infected the trial with such unfairness that the conviction resulted from a denial of due process. *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) (citations omitted).

As the Fifth Circuit has noted, "[a] prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases." *Ortega v. McCotter*, 808 F.2d 406, 410-11 (5th Cir. 1987). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181; *see Dowthitt*, 230 F.3d at 755.

The Fifth Circuit has set forth a two-step analysis for reviewing an assertion of prosecutorial misconduct. *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir.), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000). The first step is to determine whether the prosecutor made an improper remark. *See United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999), *cert. denied*, 528 U.S. 1127 (2000). In deciding whether remarks made or questions asked by a prosecutor were improper, it is necessary to view them in context. *See Greer*, 483 U.S. at 765-66; *Wise*, 221 F.3d at 152; *Barrientes*, 221 F.3d at 780. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant [ ]." *Wise*, 221 F.3d at 152. In determining whether the prosecutor's remarks prejudiced the defendant's substantive rights, the court assesses (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt. *Gallardo-Trapero*, 185 F.3d at 320.

In Texas, there are four areas in which jury argument is proper: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and (4) pleas for law enforcement. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); *Wilson v. State*, 7 S.W.3d 136,

147 (Tex. Crim. App. 1999).  Even if a jury argument exceeds these permissible areas, it will not constitute reversible error unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects new facts harmful to the accused into the trial. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (en banc).

The state habeas court found:

> 1. Because the applicant failed to raise on direct appeal his instant claims of Court of Appeals error and prosecutorial misconduct, the applicant is procedurally barred from raising these claims in the instant proceeding.

> 2. Further, because the applicant's challenge to the admissibility of the poem was raised on direct appeal and rejected by the Court of Appeals, this allegation need not be reconsidered on habeas.

> 3. In the alternative and without waiving the foregoing, the applicant fails to allege sufficient facts which, if true, would show that his due process rights were violated by prosecutorial misconduct or Court of Appeals error.

*Ex parte Walker,* Application No. 58,506-03 at 123 (citations omitted).

The Court of Criminal Appeals expressly based its denial of habeas relief on these findings.  These credibility determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir.

1999) (op. on reh'g).  Walker has not produced clear and convincing evidence to rebut these findings.

In federal habeas actions, improper jury argument by the prosecutor does not present a claim of constitutional magnitude unless it is so prejudicial that Walker's state court trial was rendered fundamentally unfair within the meaning of the Fourteenth Amendment's Due Process Clause. To establish that the prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, Walker must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that, in probability, but for the remarks no conviction would have occurred. *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986) (citations omitted).

During his closing argument, defense counsel argued that no sexual assault took place because the prosecutor had failed to prove that Walker used his sexual organ to penetrate the Complainant's sexual organ. Defense counsel pointed to the lack of seminal fluid in the Complainant's vagina.  In response, the prosecutor argued that the Complainant came forward to tell her parents, doctors, and the jury about the sexual assault.  He argued that the Complainant had no motive to lie.  He argued that the Complainant communicated through poetry and wrote down her thoughts about how she felt following the sexual assaults.  The prosecutor's response

to defense counsel's argument is not misconduct. *United States v. Chase*, 838 F.2d 743, 749-50 (5th Cir.), *cert. denied*, 108 S. Ct. 2022 (1988). Walker has failed to show that the prosecutor's comments and reading of the Complainant's poem rendered his trial fundamentally unfair. His claim should be denied.

Additionally, any alleged misconduct of the prosecutor was harmless in light of the overwhelming evidence of Walker's guilt. *See United States v. Hasting*, 461 U.S. 499, 511-12 (1983); *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003). The Complainant gave a detailed account of both sexual assaults that took place on February 2 and 3, 2000. The Complainant's father testified about his initial reaction to the news of the sexual assault and his efforts to summon the police. Officer Gastmeyer testified that the Complainant and her family were upset and that she took the Complainant to the hospital for a sexual assault examination. Employees of the Houston Police Department Crime Laboratory testified that the DNA recovered from the Complainant's clothing that she was wearing at the time of the sexual assault matched Walker's DNA profile.

The state court's decision was not contrary to clearly established federal law. Walker is not entitled to federal habeas corpus relief on this claim of prosecutorial misconduct.

## VIII. The Claim of Ineffective Assistance of Appellate Counsel

Walker complains that appellate counsel rendered ineffective assistance by failing to raise several issues on appeal. (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, pp. 8C-8E).

A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. CONST. AMEND. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). An ineffective assistance claim is governed by the familiar standards set forth in *Strickland v. Washington. Strickland*, 466 U.S. at 687. *See also Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective assistance claims against appellate counsel). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694. A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

With respect to *Strickland*'s deficiency prong, "[o]n appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green v. Johnson,* 160 F.3d 1029, 1043 (5th Cir. 1998), *cert. denied,* 525 U.S. 1174 (1999). "The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal." *Ellis v. Lynaugh,* 373 F.2d 830, 840 (5th Cir.), *cert. denied,* 493 U.S. 970 (1989); *see also Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). Instead, counsel is obligated only to raise and brief those issues that are believed to have the best chance of success. *See Schaetzle v. Cockrell,* 343 F.3d 440, 445 (5th Cir. 2003), *cert. denied,* 540 U.S. 1154 (2004); *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999). In order to prove ineffective assistance of appellate counsel, a petitioner must show that the decision not to raise an issue on appeal fell below an objective standard of reasonableness. *United States v. Phillips,* 210 F.3d 345, 348 (5th Cir. 2000), citing *Strickland,* 104 S. Ct. at 2064. This reasonableness standard requires counsel "to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id.*, quoting *Williamson*, 183 F.3d at 462-63.

As for *Strickland*'s prejudice prong, "[p]rejudice results if the attorney's deficient performance would likely render either the defendant's trial fundamentally

unfair or the conviction and sentence unreliable." *United States v. Dovalina,* 262 F.3d 472, 474 (5th Cir. 2001).

Walker complains that appellate counsel failed to challenge the DNA evidence and the sufficiency of the evidence. He argues that there were many questions about the experts and their handling of the evidence. He reasserts his claim that there was a break in the chain of custody because Officer Frost testified that she gave Walker's blood and saliva samples to a man named M.C. Henry. Dr. Earp found no evidence of tears, bruising or trauma and no seminal fluid in or around the Complainant's vagina.

This court has considered and rejected Walker's claim based on the purported unreliability of the DNA evidence. This court finds that even without the DNA evidence, the evidence of a sexual assault was overwhelming. The jury heard testimony that the Complainant was fourteen when she met Walker in January 2000. She testified that on two occasions he placed his sexual organ in her sexual organ. Raising these claims on appeal would have been frivolous. *Styron v. Johnson,* 262 F.3d 438, 450 (5th Cir. 2001)(finding that where each of the grounds underlying the alleged errors by counsel on appeal were found to lack merit, appellate counsel's failure to pursue relief on those bases does not constitute ineffective assistance of

counsel since no prejudice resulted therefrom and because the reliability of the result of the appeal was not undermined thereby).

The record shows that appellate counsel argued that:

(1)     The trial court abused its discretion in overruling the defense's objection to the admission of Complainant's poem;

(2)     Walker was punished under an unconstitutional statute which mandated a life sentence for a sexual assault where he had previously been convicted of sexual assault;

(3)     Trial court rendered ineffective assistance at the punishment phase; and

(4)     The trial court erred in overruling an objection to the jury charge on the ground that it lacked a definition of reasonable doubt.

(Brief for Appellant, pp. xiii-xiv).

Counsel's decision not to argue that the DNA evidence was unreliable or the evidence was insufficient falls within the wide range of reasonable professional assistance.

There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the proceeding would have been different but for such errors.   *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992). The state habeas court found:

49

> 4. The applicant fails to allege sufficient facts which, if true, would show that trial or appeal counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.
>
> . . .
>
> 6. The applicant fails to show that his appeal counsel's arguments fell below an objective standard of reasonableness or that the outcome of the case would have been different had counsel raised different issues.
>
> 7. The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Ex parte Walker,* Application No. 58,506-03 at 123-24.   The Court of Criminal Appeals explicitly based its denial of habeas relief on these findings.   These credibility determinations are entitled to a presumption of correctness.   28 U.S.C. § 2254(e)(1).   Walker has not produced clear and convincing evidence to rebut these findings.   The state court's decision as to the effective assistance of appellate counsel reasonably applied the law to the facts, consistent with clearly established federal law.

Walker is not entitled to federal habeas corpus relief on this claim.

## IX.   Conclusion

Respondent's Motion for Summary Judgment, (Docket Entry No. 13), is GRANTED.   Walker's petition for a writ of habeas corpus is DENIED.   This case is

DISMISSED.  Walker's motion for discovery, (Docket Entry No. 18), and motion for evidentiary hearing, (Docket Entry No. 19), are denied.  Any remaining pending motions are DENIED as moot.

The Fifth Circuit has recently reaffirmed the standards applicable to requests for certificates of appealability.  In *Haynes v. Quarterman*, the Court of Appeals stated:

> In sum, petitioner need not show that his habeas petition will ultimately prevail on the merits in order for this court to issue a COA. [*Miller-El v. Cockrell*, 537 U.S. 322, 337, 123 S. Ct. 1029, 154 L. Ed.2d 931 (2003) ] In fact, the Supreme Court has specifically instructed that a court of appeals should not deny a COA simply because the petitioner has not demonstrated an entitlement to relief. *Id.* Instead, "'where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* at 338 (quoting [*Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed.2d 542 (2000)]). "Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." *Shisinday v. Quarterman*, 511 F.3d 514, 520 (5th Cir. 2007) (citing *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997)).

*Haynes v. Quarterman*, 526 F.3d 189, 2008 WL 1808457 at *3 (5th Cir. 2008).

This court denies Walker's petition after careful consideration of the merits of

his constitutional claims.  This court denies a COA because Walker has not made the necessary showing for issuance.   Accordingly, a certificate of appealability is DENIED.

SIGNED at Houston, Texas, on _Februry 26_, 2009.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE